**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| NICHOLAS W. KARAS, as Trustee of the Marie T. Karas Irrevocable Insurance Trust dated September 2, 2008, | ) | |
| Plaintiff, | ) | |
| v. | ) | 25 C 12678 |
| THE PENN MUTUAL LIFE INSURANCE COMPANY, | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

**CHARLES P. KOCORAS, District Judge:**

This dispute between Plaintiff Nicholas W. Karas, as Trustee of the Marie T. Karas Irrevocable Insurance Trust dated September 2, 2008, and Defendant Penn Mutual Life Insurance Company ("Penn Mutual"), arises out of Penn Mutual's refusal to pay death benefits under a lapsed life insurance policy, despite the policy's advertised "No-Lapse Guarantee." Plaintiff's amended complaint alleges that Penn Mutual violated the Illinois Consumer Fraud and Deceptive Practices Act ("ICFA") through deceptive statements and unfair practices. Before the Court is Penn Mutual's motion to dismiss Plaintiff's amended complaint under Federal Rule of Civil Procedure 12(b)(6). For the reasons that follow, Penn Mutual's motion is granted.

## BACKGROUND

In September 2008, Penn Mutual issued a life insurance policy (the "Policy") to Plaintiff which had a $2 million death benefit. Plaintiff was the owner of the Policy, and the Policy insured the life of now-deceased Marie Karas. The Policy was a "Flexible Premium Adjustable Universal Life Insurance Policy," which, according to Penn Mutual, "meant that premiums were flexible and could be paid 'in any amount and at any interval . . . as long as the Net Cash Surrender Value [was] sufficient to keep it in force, or if the No-Lapse Guarantee Account less any outstanding indebtedness exceed[ed] zero as described in the No-Lapse Guarantee Requirement provision." Dkt. # 43, at 7 (citing Dkt. # 43-1, at 7, 9).[1]

On January 17, 2024, Plaintiff contacted Penn Mutual "to obtain information regarding the status of the Policy, to ensure the Policy was in force and to understand the process to obtain the death benefit, should Marie pass away." Dkt. # 37, ¶ 32. During the conversation, Penn Mutual's representative told Plaintiff that "the Policy was in full force and effect" and that "the Policy had a no-lapse guarant[ee]." *Id.* ¶ 33. This gave Plaintiff assurance that the Policy would not lapse. Plaintiff was never told by the Penn Mutual representative that the Policy would or could lapse at any time in 2024, that the no-lapse policy requirement had not been met, or that more premiums should have been paid in order for the Policy to remain in effect. Plaintiff came away

[1] In citations to the Policy and the briefs of the parties, the Court specifies the page number(s) of the document specified on the Court's Electronic Case Filing ("ECF") system, at the docket entry number noted, and not the page number printed on the face of the original document.

from the conversation with the understanding that the Policy was "in effect and enforceable and that the Trust was protected from the Policy failing by the no-lapse guarantee." *Id.* ¶ 36.

After Marie passed away in September 2024, the Trust submitted a claim to Penn Mutual to pay the Policy's death benefit. Penn Mutual denied the claim because the Policy lapsed in May 2024. [2]

The Policy Specifications page contemplates annual planned premium payments of $47,927.70 and lists a "No-Lapse" maturity date of September 15, 2056. The next sentence states that "The No Lapse Guarantee does not mean the policy would never lapse. (See section 4 of the policy.)." Dkt. # 43-1, at 4. Immediately after that, the Policy states, "NOTE: Insurance will terminate if the premiums paid and the interest credited are insufficient to cover the monthly deductions, except as provided in Section 4."[3] *Id.*

---

[2] The initial premium of $46,977.00 was paid on October 1, 2008. *See* Dkt. # 37-4, at 6. The planned premium contemplated by the Policy at page 3 was $47,927.70, to be payable annually. *See* Dkt. # 43-1, at 4. The next payment was on September 14, 2009, in the amount of $47,928.00. *See* Dkt. # 37-4, at 6. Between September 2010 and October 2013, premium payments of $47,927.70 were paid annually. *See id.* There was a $50,000 payment in September 2014, and a $25,468.59 payment in September 2017. *See id.* Between October 2018 and December 2021, annual payments were made in the amount of $47,927.70. *See id.* No payments were made after December 27, 2021. *See id.*

[3] The "Monthly Deduction" is the "sum of: (a) the Cost of Insurance for the policy month; (b) the monthly per policy expense charge; (c) the monthly expense charge per $1,000 of Specified Amount; (d) the Monthly Deduction for the policy month for any benefits provided by a supplemental agreement made as part of this policy." Dkt. # 43-1, at 15.

The No-Lapse Guarantee provision in Section 4 (entitled "Premiums") provides that "[t]his policy will not lapse as a result of a Net Cash Surrender Value insufficient to cover the Monthly Deduction for the following month if, on a monthly anniversary prior to the Maturity Date shown on Page 3, the No-Lapse Guarantee requirement is satisfied."[4] *Id.* at 8. The No-Lapse Guarantee Requirement, in turn, "is satisfied if, on a monthly anniversary prior to the Maturity Date shown on Page 3, the No-Lapse Guarantee Account less any outstanding indebtedness[5] exceeds zero." *Id.* However, the Requirement is *not* satisfied "if the indebtedness is greater than the Cash Surrender Value." *Id.*

Section 4 also contains a "Continuation of Insurance Provision" which provides that:

> If premium payments cease or if insufficient premiums are paid, the insurance provided under this policy, including benefits provided by any supplemental agreements attached to this policy, will continue, subject to the Grace Period provision, in accordance with the provisions of this policy and any such supplemental agreements for as long as the Net Cash Surrender Value is sufficient to keep it in force, or if the No-Lapse Guarantee Account less any outstanding indebtedness exceeds zero as described in the No- Lapse Guarantee Requirement provision above.

---

[4] The "Maturity Date listed on page three" is September 15, 2056.

[5] In Section 4, any reference to "indebtedness" is with a lowercase "i". "Indebtedness" (capital "I") is defined later in Section 6 (entitled "Policy Loans") as: "Indebtedness means outstanding loans on this policy plus any loan interest due or accrued. Indebtedness may be repaid in full or in part at any time while this policy is in force during the life of the Insured. This policy is the only security for indebtedness on it. If the indebtedness is greater than the Cash Surrender Value, a notice of pending termination will be mailed to the last known address of the Owner and of any assignee on record. If the excess indebtedness is not paid to the Company, this policy will terminate 61 days after the notice is mailed." Dkt. # 43-1, at 11.

*Id.* at 9.

There is also a "Grace Period" provision, which provides that if "on a Monthly Anniversary prior to the Maturity Date . . . the Net Cash Surrender Value is insufficient to cover the Monthly Deduction for the following policy month[] and the No-Lapse Guarantee Requirement is not met," the insured is given a 61-day grace period to pay the amount of premium needed to keep the Policy in force. *Id.* If the necessary premium is not paid during the grace period, the Policy will lapse at the end of the grace period. Under "Duration of Coverage," the Policy also states that "[t]he duration of coverage under this policy will depend on the amount, timing and frequency of premium payments[.]" Dkt. # 43-1, at 18.

After the Policy was issued and premiums paid, Penn Mutual would send payment reminder letters to the Trust from time to time. These letters all began with:

> We are sending you this letter as a courtesy and reminder about the no-lapse guarantee on your Guaranteed Protection UL policy. This guarantee offers you reassurance that your policy death benefit will remain intact up to the age specified in your illustration from when the policy was issued or your latest inforce illustration (if applicable). This guarantee is in effect, even if your cash surrender value drops to zero.[1]

Dkt. # 37-4, at 1. The footnote [1] stated, "The no-lapse guarantee within your illustration requires premiums to be paid on time, and that no other changes are made to your policy." *Id.* These letters went on to inform the Trust that a payment was not received within 31 days of a scheduled timeframe and stated, "If you have paid the balance later than illustrated, we recommend that you contact MICHAEL C ALBER to

review the status of your policy's guarantee.[2]" *Id.* Footnote [2] read, "In order for the guarantee to remain in effect until the age specified, premiums must be paid in the amount and timing as displayed in your illustration from when the policy was issued or your latest inforce illustration (if applicable)." *Id.*

As a result of the denial of benefits, Plaintiff filed this lawsuit asserting claims for promissory estoppel and common law fraud. Those claims were dismissed after the Court granted Penn Mutual's motion to dismiss. Plaintiff's amended complaint brings claims for violations of the ICFA. Penn Mutual again moves to dismiss.

## LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits. Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotes omitted). "This means that the complaint must offer factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Farhan v. 2715 NMA LLC*, 161 F.4th 475, 482 (7th Cir. 2025) (cleaned up). The Court will accept "well-pleaded facts in the complaint as true and draw reasonable inferences in plaintiffs' favor—but [will] not presume the truth of legal conclusions and conclusory allegations." *Cielak v. Nicolet Union High Sch. Dist.*, 112 F.4th 472, 475 (7th Cir. 2024). For these reasons, "threadbare recitals of the elements of a cause of action,

supported by mere conclusory statements, do not suffice." *Orr v. Shicker*, 147 F.4th 734, 741 (7th Cir. 2025) (quoting *Peterson v. Wexford Health Sources, Inc.*, 986 F.3d 746, 751 (7th Cir. 2021)).

## DISCUSSION

The ICFA provides a remedy for consumers who have been victimized by deceptive or unfair business practices. *Newman v. Metro. Life Ins.*, 885 F.3d 992, 1000 (7th Cir. 2018). Deceptive or unfair practices include any "misrepresentation or the concealment, suppression or omission of any material fact." *Vanzant v. Hill's Pet Nutrition, Inc.*, 934 F.3d 730, 736 (7th Cir. 2019) (quoting 815 ILCS 505/2). A practice is deceptive if it "creates a likelihood of deception or has the capacity to deceive a reasonable consumer." *Mashallah, Inc. v. W. Bend Mut. Ins. Co.*, 20 F.4th 311, 322 (7th Cir. 2021) (cleaned up). Unfair conduct "offends public policy; is immoral, unethical, oppressive, or unscrupulous; and causes substantial injury to consumers." *Id.* (cleaned up). In the amended complaint, Plaintiff brings a deceptive-practice claim in Count I, and an unfair practices claim in Count II. The Court addresses each claim in turn.

### I. Deceptive Practice

A deceptive-practice claim under the ICFA has five elements: (1) the defendant undertook a deceptive act or practice; (2) the defendant intended that the plaintiff rely on the deception; (3) the deception occurred in the course of trade and commerce; (4) actual damage to the plaintiff occurred; and (5) the damage complained of was

proximately caused by the deception. *Newman*, 885 F.3d at 1000. "An allegedly deceptive act must be viewed 'in light of *all the information* available to plaintiffs.'" *Id.* at 1001 (quoting *Phillips v. DePaul Univ.*, 2014 IL App (1st) 122817, ¶ 44) (emphasis in original). "Deception does not exist if a consumer has been alerted to the possibility of the complained-of result." *Id.* (citing *Davis v. G.N. Mortg. Corp.*, 396 F.3d 869, 883 (7th Cir. 2005)).

An insurance policy is a contract, so traditional contract interpretation rules apply to discern its meaning. *Galarza v. Direct Auto Ins.*, 2023 IL 129031, ¶ 38. A "court's primary function is to ascertain and give effect to the intention of the parties, as expressed in the policy language." *Id.* If the terms of a policy are unambiguous, they are applied as written, unless they contravene public policy. *Id.* (citing *Schultz v. Ill. Farmers Ins.*, 237 Ill. 2d 391, 400 (2010)). Ambiguity exists where the language of the insurance policy is susceptible to more than one reasonable interpretation. *Crescent Plaza Hotel Owner, L.P. v. Zurich Am. Ins.*, 20 F.4th 303, 308 (7th Cir. 2021) (citing *Founders Ins. v. Munoz*, 237 Ill. 2d 424, 433 (2010)). "Courts do not consider a disagreement between parties about the meaning of a provision to constitute an ambiguity." *Philadelphia Indem. Ins. Co. v. Bellin Mem'l Hosp.*, 126 F.4th 532, 543 (7th Cir. 2025). Nor will courts "strain to find an ambiguity where none exists." *Crescent Plaza*, 20 F.4th at 308; *see also Cont'l Cas. Co. v. Howard Hoffman and Assocs.*, 2011 IL App (1st) 100957, ¶ 42 ("'[t]he inquiry is whether the provision is

subject to more than one reasonable interpretation, not whether other possibilities can be suggested.'") (quoting *Erie Ins. Exch. v. Triana*, 398 Ill. App. 3d 365, 368 (2010)).

Plaintiff alleges that by having language in the Policy and Policy communications that it was a "guarantee no-lapse policy," Penn Mutual inaccurately and falsely portrayed the Policy as one which could never lapse. Plaintiff argues that Section 4 "contains clear language but which is deceptive or misleading." Dkt. # 48, at 7. More specifically, Plaintiff relies on language in Section 4 stating that premiums "may be paid in any amount and at any interval," as long as the payment is not less than $25.00. Dkt. # 43-1, at 7. Plaintiff argues that this portion of the Policy does not direct the insured to other sections or provisions of the Policy; therefore, a reasonable interpretation of the language in the "Payment of Premiums" section is that premiums must be paid, but the timing and amount of payment can vary and is within the control of the insured. Accordingly, Plaintiff says, "it was reasonable for Karas to believe that the payment of premiums of more that $500,000 was sufficient for the Policy to remain intact at the time Marie Karas died." Dkt. # 48, at 8.

However, as Penn Mutual says, "[t]he Policy permitted flexible premium payments as long as they were sufficient to cover the monthly deductions—not free coverage forever." Dkt. # 43, at 15; *see also Akers v. Columbus Life Ins.*, 2018 WL 3494716, at *1 (E.D. Ky. 2018) ("[A] flexible premium life insurance policy gives the insured the ability to pay various premium amounts throughout the life of the policy. The only caveat to this flexibility is that the insured must make sure that there is enough

paid into the policy in premium payments to cover the monthly cost and expenses[.]"). Plaintiff's laser focus on the "payment of premiums" subsection of Section 4 of the Policy ignores the rest of Section 4 and other important Policy provisions that must be considered as a whole. A single provision in a policy cannot be read in a vacuum; specific provisions gain meaning based on their context in the policy as a whole. *See Founders Ins.*, 237 Ill. 2d at 433 ("an insurance policy must be considered as a whole; all of the provisions, rather than an isolated part, should be examined to determine whether an ambiguity exists."). In other words, Plaintiff cannot pluck out one favorable provision and close his eyes to the rest of the Policy, then claim Penn Mutual engaged in deceptive or unfair practices because Plaintiff did not do what the Policy required of him. *See*, *e.g.*, *Anton v. Phx. Life Ins.*, 2017 WL 6948588, at *1 (S.D. Fla. 2017) ("Flexible premium adjustable life insurance policies may be confusing, . . . However, any confusion does not negate a policyholder's responsibility to maintain sufficient value in the account to cover the cost of the insurance."); *Walby v. Aviva USA*, 2013 WL 153379, at *6 (E.D. Mich. 2013) ("[T]he policy lapse was caused by [the policyholder's] failure to comply with his duty as a policyholder to maintain a positive net cash value in his [Flexible Premium Adjustable Life Insurance Policy]."); *Hancock v. Americo Fin. Life & Annuity Ins. Co.*, 272 F. Supp. 3d 763, 774–75 (E.D.N.C. 2017), *appeal dismissed and remanded*, 723 F. App'x 241 (4th Cir. 2018) ("The fact that the policyholder can change the amount of premium payments, however, does not

extinguish other provisions in the policy that require maintenance of cash value, dependent upon payment of premiums and interest against deductions.").

Plaintiff repeatedly contends that "there is no Policy language which negates the 'Payment of Premiums' language[.]" Dkt. # 48, at 11. Plaintiff is correct; but, again, that provision cannot be read in isolation—the Policy must be read as a whole. The Policy Specifications page expressly states that "The No Lapse Guarantee does not mean the policy would never lapse," and directs the reader to Section 4. Section 4, in turn, provides detailed information regarding the meaning of the No-Lapse Guarantee, what is required to maintain the No-Lapse Guarantee, and the manner in which the No-Lapse Guarantee Account is calculated. Plaintiff needed only to turn the page. *See Howard v. Sunset Life Ins. Co. of Am.*, 2002 WL 24053, at *1 (Tex. Ct. App. 2002) ("As the decision-maker regarding the flexible premiums, it was incumbent on [the policyholder] to monitor his policy and ensure he was paying sufficient premiums to maintain the policy."). Additionally, under "Duration of Coverage," the Policy also states that "[t]he duration of coverage under this policy will depend on the amount, timing and frequency of premium payments . . . ." Dkt. # 43-1, at 18. The terms of the Policy permitted Plaintiff to make premium payments of at least $25.00 at any time, but they also required Plaintiff to maintain premiums sufficient to cover the monthly deductions.

*Newman*, relied on by Plaintiff, does not dictate a different result. In *Newman*, the Seventh Circuit reversed the dismissal of an ICFA claim against an insurer where

the plaintiff alleged that a brochure advertising a "Reduced-Pay" option misled her into believing that the policy premiums would not increase after the age of 65. 885 F.3d at 1003. The Seventh Circuit concluded that the insurer's brochure did not warn the plaintiff about the possibility of a premium increase after age 65, and the insurer never described the Reduced-Pay plan anywhere outside the brochure. The plaintiff "could have parsed every word in the insurance policy and never found information that would have corrected her impression of the Reduced-Pay option." *Id.* at 1001.

Unlike the *Newman* policy, the Policy in this case explains that the no-lapse guarantee did not mean the Policy would never lapse, outlines the no-lapse guarantee requirements, and sets forth how the account value is determined. This is therefore more like one of those unfortunate cases in which the insured was "warned about the undesirable result and simply misconstrue[d] the material offered by the insurance company." *Id.* (citing *Toulon v. Cont'l Cas. Co.*, 877 F.3d 725 (7th Cir. 2017)).

Plaintiff also alleges Penn Mutual engaged in deceptive conduct based on its written communications "which contained no language stating the no lapse policy could in fact lapse and because Penn's representative failed to inform Karas that the Policy was close to lapsing." Dkt. # 48, at 12. However, the Policy specifically allows for a grace period of 61 days to allow for the payment of sufficient premium to keep the Policy in force, and mandates that notice of the amount of premium needed is sent at least 30 days before the end of the grace period. Plaintiff does not allege in the amended complaint that Penn Mutual failed to timely send a lapse notice. Based on the amended

complaint's allegations, the Policy operated precisely as the express terms permitted, and Plaintiff has failed to plausibly allege a deceptive act or practice. Penn Mutual's motion to dismiss Count I is granted.

## II. Unfair Conduct

Unfairness under the ICFA depends on three factors: "(1) whether the practice offends public policy; (2) whether it is immoral, unethical, oppressive, or unscrupulous; [or] (3) whether it causes substantial injury to consumers." *Robinson v. Toyota Motor Credit Corp.*, 201 Ill. 2d 403, 417–18 (2002). A significant showing that any of the three factors is met is enough; so too are facts that, to a lesser degree, satisfy all three. *Id.* at 418. Conduct is immoral, unethical, oppressive, or unscrupulous under ICFA if it leaves the consumer "with little choice but to submit to it." *Newman*, 885 F.3d at 1002–03; *see also Robinson*, 201 Ill. 2d at 419–20 (holding that oppression requires a "lack of meaningful choice" for consumers).

Plaintiff argues that Penn Mutual's "conduct of promoting the flexible payment of premiums in the Policy and other communications, other broad Policy language about paying premiums in varying amounts and at various times is oppressive." Dkt. # 48, at 14. Yet "there is nothing oppressive or unscrupulous about giving a counterparty the choice to fulfill his contractual duties or be declared in default for failing to do so." *See Cohen v. Am. Sec. Ins. Co.*, 735 F.3d 601, 610 (7th Cir. 2013). Plaintiff does not allege he was coerced into purchasing the Policy, nor did Plaintiff lack reasonable alternatives in the marketplace. He could have easily looked elsewhere

for life insurance or selected a different type of policy. The Policy provided Plaintiff with all of the information necessary to make a meaningful choice in selecting this type of insurance. This freedom of choice belies Plaintiff's claims that Penn Mutual's conduct was oppressive.

Plaintiff also argues the no-lapse provision violates Illinois statutory law, which prohibits language which causes insurance policies to be "unjust, unfair, inequitable, ambiguous, misleading, inconsistent, deceptive," or contrary to public policy. *See* 215 ILCS 5/143(1). Plaintiff points to a "Group Universal Life Review Requirements Checklist" published by the Illinois Department of Insurance, which states that "Language such as 'no lapse', 'no lapse guarantee' or 'death benefit guarantee' is permitted only if there is a statement, in close proximity to the provision, indicating that the guarantee does not mean the policy or contract would never lapse." Dkt. # 48-2, at 5. However, the Policy satisfies this requirement. Section 1, entitled "Policy Specifications" lists the "Schedule of Planned Premiums" and the "No-Lapse" maturity date, immediately followed by the sentence, "The No Lapse Guarantee does not mean the policy would never lapse. (See section 4 of the policy)." Dkt. # 43-1, at 4. The very next sentence is "NOTE: Insurance will terminate if the premiums paid and the interest credited are insufficient to cover the monthly deductions, except as provided in Section 4." *Id.* And, again, Section 4 explains how the no-lapse guarantee works.

Similarly, the letters attached to the amended complaint state, "The no-lapse guarantee within your illustration requires premiums to be paid on time, and that no

other changes are made to your policy," and "In order for the guarantee to remain in effect until the age specified, premiums must be paid in the amount and timing as displayed in your illustration from when the policy was issued or your latest inforce illustration (if applicable)." *See*, *e.g.*, Dkt. # 37-4.

Plaintiff has failed to allege facts to support a claim that Penn Mutual's actions were "immoral, unethical, oppressive, or unscrupulous." The unfair acts and practices claim is dismissed, as well.

**<u>CONCLUSION</u>**

For the foregoing reasons, Penn Mutual's motion to dismiss is granted and Plaintiff's amended complaint is dismissed without prejudice. Although the Court is skeptical that any amendment could cure the defects identified above, if Plaintiff believes in good faith that he can allege additional facts that would change the Court's analysis, the Court will grant Plaintiff leave to file a second amended complaint. By 11/6/2026, Plaintiff shall notify the Court whether he intends to file a second amended complaint by filing a written status report.

It is so ordered.

Charles P. Kocoras
Charles P. Kocoras
United States District Judge

Date: October 16, 2026